IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| KEITH JONES, <br><br>             Plaintiff, <br><br>    vs. <br><br> BNSF RAILWAY COMPANY, a Delaware corporation, <br><br>             Defendant. | CV 18–146–M–DLC <br><br><br> ORDER |

Before the Court is Defendant BNSF Railway Company's Motion for Summary Judgment. (Doc. 51.) Plaintiff Keith Jones filed this lawsuit on August 23, 2018, alleging that the termination of his employment was unlawful under the Federal Railroad Safety Act ("FRSA").

Jones alleges that BNSF took adverse employment actions against him on two occasions: (1) when BNSF investigated and disciplined him in January 2017; and (2) again when BNSF terminated his employment in July of that year. (Doc. 1.) Jones contends that he was disciplined and terminated, at least in part, because he advocated for safer working conditions. Specifically, Jones claims that he was fired for: (1) reporting railroad conditions causing crew fatigue; (2) seeking

treatment for and notifying the railroad of his diagnosed sleep apnea; and (3) reporting an unsanitary bathroom.  (Doc. 1.)

Here, there is "no genuine dispute as to any material fact[,] and [BNSF] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Thus, the Court grants the motion.

## BACKGROUND[1]

BNSF first hired Jones as a conductor and engineer in 2006.  (Doc. 82 at 1–2.)  For reasons irrelevant to this lawsuit, Jones's employment with BNSF ended in 2010, but he was rehired less than a year later, on February 21, 2011.  (*Id.* at 2.)  Jones was diagnosed with sleep apnea prior to his first term of employment with BNSF.  (*Id.*)  BNSF was aware of his diagnosis when Jones was rehired.  (*Id.*)

At some point during the summer of 2016, Jones's sleep deteriorated—in his words, it "wasn't as good as it had been."  (Doc. 51-2 at 3; Doc. 82 at 3.)  In late August, he saw a sleep specialist, Dr. Pat Burns of Glacier Headache & Sleep Medicine, who recommended that Jones undergo a new sleep study to ensure that his CPAP machine was operating on the correct settings.  (Docs. 51-4; 82 at 3.)  In response to Jones's request that Dr. Burns support Jones's claim for medical leave,

---

[1] To the degree that the facts are disputed, they are construed in favor of Jones, the nonmoving party.  *Rollins v. Community Hosp. of San Bernardino*, 839 F.3d 1181, 1185 (9th Cir. 2015).  That said, where the facts are not themselves disputed but rather how the facts are to be interpreted, the Court draws only "*reasonable* inferences in the light most favorable to the party opposing the summary judgment."  *Scott v. Harris*, 550 U.S. 372, 378 (2007) (emphasis added).

Dr. Burns also noted his concern that, as reported by Jones, BNSF's scheduling practices may not sufficiently accommodate Jones's sleep needs.  (Docs. 51-4 at 1; 82 at 3.)  Dr. Burns wrote as an order: "Mr. Jones has sleep apnea & will be undergoing a report study for his pressure.  He should refrain from work until this is completed."  (Docs. 51-5; 82 at 3.[2])

Shortly after Jones's appointment with Dr. Burns, in September of 2016, he had a conversation with his superintendent, James Pino.  (Doc. 82 at 4.)  BNSF describes this meeting as a "coach[ing] and counsel[ing]" session, while Jones classifies it as "a talking to" that made him feel "intimidated."  (*Id.*)  Regardless of how the parties describe the discussion, however, it is clear that Pino and Jones talked about Pino's expectations regarding communications with BNSF dispatchers.  (Doc. 51-10 at 9.)  The conversation was prompted by Pino's understanding that Jones had made "specific . . . comments to [a] Dispatcher in a very argumentative way, and then . . . somebody else on the radio responded, um, with, like a cat meow, saying wow, and then Jones . . . replied to that, and said, yep, that's right, [S]tone is done playing games."[3]  (*Id.*)  Pino played the audio of the conversation to Jones, explaining his expectation that Whitefish crewmembers

---

[2] Jones does not specifically dispute this fact, but he states that he "does not recall having received" the doctor's note attached as an exhibit.  (Doc. 82 at 3.)  However, setting aside that he was the patient and therefore likely aware of his doctor's orders, he does not dispute the authenticity of the note.

[3] According to Pino, Jones at times refers to himself as "Stone."  (Doc. 82-10 at 9.)

would be respectful even when the dispatchers were frustrated, and Jones agreed to act appropriately in the future.  (*Id.* at 10; Doc. 82 at 4.)

Early the following month, Jones completed and submitted several forms documenting his belief that BNSF's scheduling practices increased crew fatigue, to the detriment of workplace safety.  Jones filled out and turned in three Safety Issue Resolution Process ("SIRP") forms—one each day on October 7, 8, and 9, 2016. (Docs. 51-6; 51-7; 51-8; 82 at 4.)  In fact, the first two forms are identical, save for the date and signature lines.  In those forms—one of which appears to be a modified photocopy of the other—Jones wrote that "inac[c]urate line ups contribute to fatigue issues, creating unsafe working conditions."  (Docs. 51-7; 51-8.)  He submitted a similar form on the 9th, stating that his safety concern arose from late modifications to his schedule.  (Docs. 51-7; 51-8; 82 at 4.)

On November 2, 2016, Jones filled out a fatigue monitor—a form used by union employees to report fatigue-related issues.  (Docs. 82 at 4; 51-9.)  These forms are submitted not to the railroad but to the union, which compiles and shares the information with the Federal Railroad Administration ("FRA").  (Doc. 82 at 4.) Fatigue monitors may also be used during negotiations between the union and the railroad.  (*Id.*)

The event resulting in Jones's first disciplinary action occurred days later, in the early morning hours of November 5, 2016.  (Doc. 82 at 4–5.)  Jones was tired,

having been called into work at 2:45 a.m., well before his previously scheduled time of 5:25 a.m.  He arrived at the worksite less than 17 hours after his last shift ended.  (Doc. 82 at 5.)  Moreover, he had a sinus infection and was unable to get high-quality sleep.  (Doc. 85-2 at 2–3.)

Jones's train left the Whitefish station.  At one point, it was traveling at 5 m.p.h. due to foggy conditions, and a dispatcher, apparently irritated by the train's slow progress, stated to Jones, "you guys are unbelievable."  (Doc. 82-2 at 4.)  The dispatcher notified Jones that the train would be meeting multiple trains at Belton, Montana.  (Doc. 82 at 5.)  Jones replied, "You might as well keep us here all night."  (*Id*.)

The train reached Belton just before 5:00 a.m.  (Doc. 82 at 6.)  Jones informed the dispatcher that he would take a nap—expressly permitted under BNSF policy—while waiting for the other trains to pass.  (*Id*.)  When Jones's train was cleared to leave the Belton siding, it resumed travel eastward to Essex, Montana, where the train was again sidelined to allow other trains to pass from the opposite direction.  (*Id*.)  Jones informed a dispatcher that he was tired, explained why, and said that he would like to take "a nap or two."  (*Id*.)

The dispatcher informed Chris Lucero, Montana's head of dispatch, of her discussion with Jones.  (*Id*.)  Lucero contacted Pino, and together they decided that Jones and his conductor should be ordered back to Whitefish and replaced by

another train crew.  (*Id*. at 6–7.)  The train was delayed while the swap occurred.
(*Id*. at 7.)

Jones returned to Whitefish, and he filled out another fatigue monitor on
November 6, 2016.  That day, Pino called Jones into his office, along with Brent
Wetsch, Jones's union chairman, and a local chairman from the SMART-TD
union.  (Doc. 82-2 at 4.)  Pino played audio recordings of the conversations
between Jones and the dispatchers, and he initiated a discussion about whether a
disciplinary investigation into Jones's conduct should be initiated.  (Docs. 82 at 8;
82-2 at 4.)  According to Wetsch, "Pino was the only individual present at the . . .
meeting who thought that Jones violated any rules or that a disciplinary
investigation should be launched into Jones's conduct."  (Docs. 82 at 8; 82-2 at 5.)

On November 8, 2016, BNSF notified Jones of an imminent investigation
"for the purpose of ascertaining the facts and determining your responsibility, if
any, in connection with your alleged discourteous and quarrelsome behavior
including alleged intent to cause train delay while working as an engineer on duty
at 0245 hours MST on November 5, 2016 at Whitefish, MT."  (Doc. 51-12.)  The
investigation was ultimately held on January 11, 2017, after Jones filled out three
additional fatigue monitors and one SIRP form in November and December.  (Doc.
82 at 8.)  Following a hearing, BNSF imposed a "Level S" (or "serious") discipline
upon Jones on January 27, 2017.  (Doc. 15 at 2.)

On December 5, 2016, Jones informed BNSF that he was not sleeping well and did not feel that he could safely perform his job duties without first seeking medical care.  (Doc. 82 at 8–9.)  The next day, BNSF sent a letter explaining to Jones that "you have been removed from service pending an assessment of your fitness for duty.  In our conversation you have stated that you do not feel safe to work as you don't feel that you are getting proper sleep."  (Doc. 51-17.)  Before his return, Jones would need to submit the results of a scheduled sleep study and 30 days of downloaded information from his CPAP.  (*Id.*)  Jones's CPAP was titrated as a result of the sleep study, and his treating physician was happy with the titration, releasing Jones for work with no restrictions on January 4, 2017.  (Docs. 51-18 & 51-19.)  Jones returned to work, but he apparently continued to suffer from fatigue, as he filled out four fatigue monitors and three SIRP forms in late January and February.

The event resulting in Jones's second Level S discipline and ultimate termination occurred on May 10, 2017.  According to Pino, the conductor on the train stated that he warned Jones of an upcoming 25 m.p.h. speed restriction before leaving to use the restroom.  (Doc. 51-28 at 2.)  The conductor "proceeded to tell [Pino] that when he came out of the restroom he noticed that the speedometer was rated at 31 to 32 miles an hour and at that time he asked [Jones] if they were in the . . . speed restricted location."  (*Id.*)  "He stated that [Jones's] answer was, 'I don't

know,' and that . . . [Jones] at that time began to slow the train down." (*Id*.)  When the conductor asked Jones how fast they had been going, Jones allegedly said, "Don't worry; we did not go federal." (*Id*.)  Jones apparently disagrees with this account, as he disputes that he knew of the speed restriction before entering the restricted zone.  (Doc. 82 at 11.)

The employee tasked with reviewing the train's braking records verified that "heavy dynamic braking [was] applied to the train at 36 miles an hour[4] in an effort to slow the train back down to the required speed of 25 miles per hour."  (Doc. 51-28 at 4.)  Consistent with federal regulation, BNSF notified the FRA of an event involving speeds of 10+ m.p.h. over the limit, resulting in an automatic 30-day suspension of Jones's certification as an engineer.  (Doc. 51-19 at 3–4.)  The conductor also received an automatic 30-day suspension, but he, unlike Jones, was allowed to return to work.  (*Id*. at 4.)  Jones does not dispute that a speeding event occurred, but he does dispute the determination that the speed was greater than 10 m.p.h. over the limit.  (Doc. 82 at 12.)  A formal investigation was held on June 29, 2017, conducted by Rick Stauffer, Director of Administration for the Montana Division, and Jones received a second Level S disciplinary action.  (*Id*.)

---

[4] The employee concedes that if his calibrations were "way off," it may be that the train was traveling less than 25 m.p.h. over the limit, but he suggested that it was highly improbable that such would be the case—indeed, the disparity in wheel size that could result in such an error would result in the wheels being condemned.  (Doc. 51-29 at 2.)

Brian Clunn, an executive-level employee in BNSF's headquarters, reviewed the formal investigation and exhibits regarding the May 10, 2017 event. (*Id*.)  Because it was Jones's second Level S discipline, and because of the perceived seriousness of the violation, dismissal was recommended.  (*Id*. at 12–13, 51-30.)  Jon Gabriel, Manager for the Montana Division, adopted that recommendation.  (Doc. 82 at 13.)  Jones was terminated on July 17, 2017.  (*Id*.)

Two other events, which do not fit neatly into the chronology listed above, are relevant to this lawsuit.  First, in 2014, then-General Manager Dan Fransen held a town hall meeting for employees, which Jones attended.  Jones made a comment about the lack of predictive scheduling and its effect on crew fatigue— the same issue raised in the SIRP forms submitted throughout 2016 and 2017. (Doc. 82-2 at 3.)  Jones claims that Fransen was extremely upset by his comment. Second, in June of 2016, Jones reported an unsanitary bathroom.  (Doc. 82-1 at 40.)

**LEGAL STANDARDS**

## I.    Summary Judgment

A court must grant summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other

words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  "[I]f reasonable minds could differ as to the import of the evidence," summary judgment must be denied. *Id.* at 250–51.

## II.    The FRSA

The FRSA provides that a railroad carrier may not "discharge, demote, suspend, reprimand, or in any other way discriminate against an employee for reporting, in good faith, a hazardous safety or security condition."  49 U.S.C. § 20109(b)(A). "A claim for unlawful retaliation under the FRSA has two stages: the prima facie stage, *see* 49 U.S.C. § 42121(b)(2)(B)(i)–(iii)[5]; 29 C.F.R. § 1982.104(e), and the substantive stage, *see* 49 U.S.C. § 42121(b)(2)(B)(iii)–(iv); 29 C.F.R. § 1982.109(a)–(b)."  *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018).  Each stage requires application of a burden-shifting framework.

First, the employee must establish a prima facie case for retaliation by alleging the existence of four elements:

> (i) The employee engaged in a protected activity (or . . . was perceived to have engaged or to be about to engage in protected activity);

---

[5] The FRSA, 49 U.S.C. § 20109, expressly incorporates the standards set forth in § 42121, which would otherwise appear to apply only to the aviation industry.  49 U.S.C. § 20109(d)(2).

(ii) The respondent knew or suspected that the employee engaged in the protected activity (or . . . perceived the employee to have engaged or to be about to engage in protected activity);

(iii) The employee suffered an adverse action; and

(iv) The circumstances were sufficient to raise the inference that the protected activity (or perception thereof) was a contributing factor in the adverse action.

29 C.F.R. § 1982.104.  If the employee meets his or her burden, the employer can defeat the employee's prima facie case by "demonstrat[ing], by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of [the protected activity]."  49 U.S.C. § 42121(b)(2)(B)(ii).

Second, "[a]t the substantive stage, a violation will be found 'only if the complainant demonstrates that any [protected activity] *was* a contributing factor in the unfavorable personnel action alleged in the complaint."  *Rookaird*, 908 F.3d at 460 (quoting 49 U.S.C. § 42121(b)(2)(B)(iii)) (emphasis and alteration in original). "Then—like at the prima facie stage—the employer can defeat the retaliation claim 'if the employer demonstrates by clear and convincing evidence that the employer would have taken the same unfavorable personnel action in the absence of [the protected activity]."  *Id.* (quoting 49 U.S.C. § 42121(b)(2)(B)(iv)) (alteration in original).

**DISCUSSION**

Jones concedes that he "was terminated by BNSF for having two Level-S severity disciplines under BNSF's policy." (Doc. 81 at 5.)  However, he contends that these disciplinary actions were motivated by his "legitimate safety complaints to the railroad regarding how BNSF's policies negatively impacted fatigue among his co-workers and himself." (*Id.*)  At heart, his claim is that he was an outspoken advocate for predictive scheduling and that BNSF disciplined and terminated him for that advocacy.  Jones also argues—though less vigorously—that he was disciplined for reporting unsanitary bathroom conditions in the summer of 2016. The Court first addresses Jones's core claim regarding fatigue before turning to the unsanitary bathroom claim.

## I.   Jones's Fatigue-Related Reports

BNSF raises several arguments in favor of summary judgment on Jones's claim that he was disciplined and terminated in retaliation for reporting that BNSF's scheduling practices caused crewmember fatigue.  First, it argues that Jones did not, in fact, "report[] . . . a hazardous safety or security condition" because: (1) federal law sets the minimum standard for safety in railroad scheduling, and BNSF met that standard; and (2) Jones's fatigue is largely attributable to his sleep apnea, which is not "a hazardous . . . condition" under the FRSA. 49 U.S.C. § 20109(b)(1)(A).  Second, BNSF contends that Jones has not

–12–

established a prima facie case of retaliation.  Third and finally, BNSF claims that it

would have terminated Jones even if Jones had not engaged in protected activity

under the FRSA.

The Court disagrees with both of BNSF's theories that Jones did not engage

in a protected activity: other federal statutory schemes do not preclude the present

lawsuit, and Jones's complaints are protected under the FRSA to the degree that

they relate to BNSF's own scheduling practices.  But it agrees with BNSF on the

other two points, either of which would be sufficient on its own.  BNSF is entitled

to summary judgment because the "circumstances [are not] sufficient to raise the

inference that the protected activity (or perception thereof) was a contributing

factor in the adverse action."  29 C.F.R. § 1982.104.  Moreover, given the

decisionmakers' lack of knowledge of Jones's reports, BNSF has shown, "by clear

and convincing evidence, that [it] would have taken the same unfavorable

personnel action in the absence of [the protected activity]."  49 U.S.C.

§ 42121(b)(2)(B)(ii).

**A. Preclusion**

BNSF contends that Jones's fatigue-related complaints are not protected

under the FRSA because BNSF's policies and procedures were consistent with the

Hours of Service Act and the Federal Rail Safety Improvement Act.  The Hours of

Service Act limits the number of cumulative and consecutive hours and days a

railroad employee may work, and it sets forth minimum off-duty hours.  49 U.S.C. §§ 21103–21105.  It further provides that "the number of hours established by [the Act] that an employee may be required or allowed to be on duty is the maximum number of hours consistent with safety," and that unions may negotiate with railroads for "[s]horter hours of service and time on duty."  49 U.S.C. § 21107.

Under the Federal Rail Safety Improvement Act, railroads must "develop and update at least once every 2 years a fatigue management plan that is designed to reduce the fatigue experienced by safety-related railroad employees and to reduce the likelihood of accidents, incidents, injuries, and fatalities caused by fatigue."  49 U.S.C. § 20156(f)(1).  Railroads are obligated to "consult with, employ good faith, and use . . . best efforts to reach agreement with, all of its directly affected employees, including any [union], on the contents of the safety risk reduction program."[6]  49 U.S.C. § 20156(g)(1).

BNSF argues that Jones's claims are preempted or precluded.  (Doc. 52 at 12–15.)  The Hours of Service Act, it contends, "occup[ies] the field of work/rest cycles for railroad employees."  (*Id*. at 13.)  Similarly, BNSF claims that the Federal Rail Safety Improvement Act "precludes other laws attempting to regulate

---

[6] BNSF hints that an employee is not entitled to FRSA protection for fatigue-related reports to the degree that the challenged practices are subject to a collective bargaining agreement.  (Doc. 52 at 15.)  But, even assuming that it is true that BNSF cannot implement predictive scheduling without union agreement, an individual employee may still, "in good faith," believe that the lack of predictive scheduling constitutes a hazardous safety condition.  49 U.S.C. § 20109(b)(1)(A).

work and rest periods." (*Id*. at 14.)  Because BNSF did not violate either Act, the

argument goes, "Jones' work schedule was safe" . . . "and did not create a

'hazardous safety condition,'" meaning that Jones's activities are not "protected"

under FRSA.  (*Id*.)

Jones responds that his interpretation of the FRSA is not precluded by the

existence of other federal laws governing safety and fatigue.  (Doc. 81 at 9–18.)

The Court agrees.  The fact that BNSF's scheduling practices were allowed under

federal law does not mean that, as a matter of law, Jones was not disciplined for

"reporting, in good faith, a hazardous safety or security condition."  49 U.S.C.

§ 20109(b)(A).

The Hours of Service Act and the Federal Rail Safety Improvement Act

demonstrate Congress's awareness of the interplay between fatigue and rail safety.

They do not crowd the FRSA, which provides for an additional mechanism to

increase safety.  The FRSA protects whistleblowers, some of whom may report

fatigue; the Hours of Service Act sets forth minimum industry-wide standards to

limit fatigue; and the Federal Rail Safety Improvement Act requires railroads to

work with the executive branch to continue to find ways to decrease fatigue.

Indeed, the FRSA explicitly protects employees who "accurately report hours on

duty" pursuant to the Hours of Service Act.  49 U.S.C. § 20109(a)(7).  The acts

"are complementary and have separate scopes and purposes," and there is no issue

of preclusion.  *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 118 (2014).

### B. Hazardous Safety Conditions

BNSF also argues that Jones did not engage in a protected activity when he

filled out safety reports regarding BNSF's scheduling practices and fatigue because

Jones's own "personal fatigue and non-work-related sleep apnea" are not

"hazardous safety conditions" within the meaning of the FRSA.  (Doc. 52 at 17.)

The Court agrees that the FRSA is indifferent to reports of allegedly unsafe

conditions that fall outside a railroad's control.  *See, e.g.*, *Hunter v. CSX Transp.,*

*Inc.*, *Stokes v. Se. Penn. Transport. Auth.*, 657 Fed. Appx. 79, 82 (3d Cir. 2016);

*Williams v. Ill. Cent. R.R. Co.*, No. 3:16-CV-00838-CWR-FKB, 2017 WL

2602996, at *2 (S.D. Miss. June 15, 2017) ("Reading the statute to include self-

reported illnesses as hazardous safety conditions would expand protected activity

to include any ailment, including drunkenness, fatigue, or even personal

incompetence, that an employee believes might affect his or her ability to perform

the essential functions of the job."); *Murdock v. CSX Transp., Inc.*, No. 3:15-cr-

01242, 2017 WL 1165995, at *5 (N.D. Ohio March 29, 2017) ("Plaintiff's personal

illness does not qualify him for protection under the statute . . . .").

Thus, Jones cannot succeed to the degree that he reported that his diagnosed

sleep apnea made him too tired to safely perform his work.  Specifically, Jones

cannot claim that his conversations with dispatch on November 5, 2016 were reports of a hazardous safety condition when the hazard was his exhaustion, particularly when that exhaustion was due in large part to not only his sleep apnea but a sinus infection.  The Court agrees that BNSF's scheduling practices may have worsened Jones's fatigue.  But it does not logically follow that Jones reported BNSF's scheduling practices by asserting that he was physically tired and wanted to nap.

However, some of Jones's reports targeted BNSF's scheduling practices. Specifically, he is protected under the FRSA for his completion and submission of SIRP forms requesting predictive scheduling and discussing fatigue.

### C. Prima Facie Case

Although Jones did, in fact, engage in protected activity, the "circumstances [are not] sufficient to raise the inference that the protected activity (or perception thereof) was a contributing factor in the adverse action."  29 C.F.R. § 1982.104.  It is true that there is a temporal connection between Jones's verbal altercations with dispatchers on November 5, 2016 and the ensuing investigation.  However, there is no reason why BNSF should have viewed those conversations as reports of "a hazardous safety or security condition," given that—as explained above—Jones's personal exhaustion is not in and of itself a safety condition as contemplated by the FRSA.

Jones contends that BNSF misconstrued what occurred between him and the dispatchers.  He claims that the first dispatcher was openly hostile toward him and that Jones merely asserted his right to take a nap while the train was waiting for the tracks, consistent with company policy.  (Doc. 82 at 4–6.)  All of this may be true, but it does not demonstrate retaliation.

A railroad may take action against an employee that could conceivably be wrongful under other legal schemes without running aground of the FRSA.  *See Koziara v. BNSF Ry. Co.*, 840 F.3d 873, 878 (7th Cir. 2016) ("The [FRSA] does not punish railroads for disciplining (including firing) employees unless the discipline is retaliatory.").  There is a factual dispute regarding whether Jones was "discourteous and quarrelsome" and acted with the "intent to cause train delay" in violation of company policy.  (Doc. 51-12.)  But the dispute is not material.

The connection between Jones's safety-related reports and the disciplinary investigation is merely temporal, and that is not enough under the circumstances.  *See, e.g.*, *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 791–92 (8th Cir. 2014).[7]

---

[7] This Court does not go so far as the Eighth Circuit, which has "consistently held that 'more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation.'"  *Kuduk*, 768 F.3d 792 (quoting *Hervey v. Cty. of Koochiching*, 527 F.3d 711, 723 (8th Cir. 2008)).  Indeed, such a holding conflicts with the regulatory scheme, which makes clear that an inference of retaliation "[n]ormally . . . is satisfied, for example, if the complaint shows that the adverse personnel action took place shortly after the protected activity, giving rise to the inference that it was a factor in the adverse action."  29 C.F.R. § 1979.104(b)(2).  As discussed, though, no such inference follows in the present case.

Significantly, Jones did not submit a report prior to the exchange.  Consistent with company policy, he wanted to take a nap while waiting for the tracks to clear.  It was not wrong to take a nap, but asking for a nap or informing a dispatcher of one's plan to take a nap does not constitute a protected activity under the FRSA. The protected activity, submitting a SIRP form, did not occur until after disciplinary action was initiated.

It is clear that a heated exchange occurred in the early morning hours of November 5, 2016 and that BNSF ultimately replaced Jones and his crew as a result of that exchange.  The actions taken by BNSF clearly demonstrate that it believed—whether correctly or not—that Jones engaged in prohibited conduct.  If, as Jones argues, the relevant decision-makers were upset with Jones for asking for predictive scheduling, it is highly unlikely that they would have taken the drastic action of replacing the train crew that morning, an action which surely cost the railroad time and money.  If there is an inference to be drawn from the crew replacement, it is that the railroad was legitimately concerned about Jones's ability to safely operate the train.  In any event, the soundness of that decision is not at issue in this litigation.

Jones argues at length that retaliation should be inferred from a comment that he made in a 2014 town hall meeting for BNSF employees, at which time Jones raised his concern regarding the effect of erratic work schedules on staff

fatigue.  (Doc. 82-2 at 3.)  To support his claim, he points to a declaration from Chairman Wetsch, who claims that "this event was likely the genesis of BNSF's retaliatory conduct toward Jones." (*Id.*)  Wetsch states that then-General Manager Fransen, who was conducting the town hall, "took Jones out of the safety meeting to chastise him and was openly hostile." (*Id.*)

Wetsch's declaration is the strongest support for Jones's retaliation claim, but it is not strong enough.  First, there is not even temporal proximity between the 2014 meeting and the disciplinary actions taken in 2016.  The record does not substantiate a chain of events beginning in 2014 and ending with Jones's two Level S disciplinary actions and termination.  If, as Wetsch claims, the town hall marked the beginning of BNSF's hostility toward Jones's safety advocacy, surely there would be something, beyond a declaration made several years after the event, to support an inference of causation.  Second, the record does not support a finding that Rick Stauffer, the sole decisionmaker regarding Jones's first Level S disciplinary action, was aware of the town hall meeting, let alone that he relied upon it in assessing discipline.  (Doc. 85-4.)  And Fransen left BNSF's employ in March 2017, months before the second Level S disciplinary action took place. (Doc. 85-5.)  *See Conrad v. CSX Transp., Inc.*, 824 F.3d 103, 107 (4th Cir. 2016) ("The 'knowledge' relevant for a retaliation claim under the FRSA must be tied to the decision-maker involved in the unfavorable personnel action.").

As for the second Level S violation, even Jones does not argue that it was not serious enough to warrant a 30-day suspension.  He claims that BNSF may not have done everything in its power to ensure that the speeding event was significant enough to mandate its report to federal regulators.  (Doc. 52 at 11.)  At its core, his argument stemming from the speeding event is that he would not have been fired if he had not already had the first Level S disciplinary action on his record.  However, because a reasonable jury could not conclude that the first action was retaliatory, Jones has not established a prima facie case of retaliation under the FRSA.

### D. Termination in the Absence of Protected Activity

In the alternative, summary judgment is appropriate because the evidence demonstrates that Jones would have been terminated even if he had not been an advocate for predictive scheduling.  If the employee meets his or her burden of establishing a prima facie case, the employer can nonetheless succeed at the summary judgment stage by "demonstrat[ing], by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of [the protected activity]."  49 U.S.C. § 42121(b)(2)(B)(ii).  Here, BNSF has met that steep burden.  *See Araujo v. N.J. Transit Rail Ops., Inc.*, 708 F.3d 152, 159 (3d Cir. 2013) (discussing the history of the FRSA and the purposefully low burden on employees and high burden on employers).

Two individuals were responsible for the decision to terminate Jones's employment. As set forth more fully in the factual background section of this order, Clunn made the recommendation of dismissal, and Gabriel adopted it. Nothing in the record supports a finding that Clunn and Gabriel were aware of—let alone relied upon—Jones's reports regarding fatigue when they made their decisions regarding Jones's employment. *See Gunderson v. BNSF Ry. Co.*, 850 F.3d 962, 970 (8th Cir. 2017).

Jones argues that data regarding similarly situated employees defeats summary judgment on this point. He points to "BNSF comparator data regarding employees charged with violating the same or similar rules as Jones that would have mandated a Level-S incident or review of BNSF comparator data identifying whether or not BNSF employees who received 2 or more Level-S violations . . . were dismissed." (Doc. 81 at 26.) However, where, as here, the decisionmakers were unaware of the employee's safety reports, comparator data is unnecessary and irrelevant. BNSF does not need to "prove similar or identical issues received [the] same discipline" because it has proven that Jones's safety reports did not factor into the decisions to discipline Jones. (Doc. 81 at 26.)

## II.    Unsanitary Bathroom

Jones has also alleged that BNSF retaliated against him for "[r]eporting a hazardous safety condition of an unsanitary bathroom on a locomotive in or around

June 2016." (Doc. 1 at 4.) Assuming without deciding that this report qualifies as a protected activity under the FRSA, Jones has not established a prima facie case of retaliation.

To succeed at step one under the FRSA analysis, an employee must show that "[t]he circumstances were sufficient to raise the inference that the protected activity (or perception thereof) was a contributing factor in the adverse action." 29 C.F.R. § 1982.104. No such inference is logical here. Jones claims only that "[a] juror could conclude that BNSF was made aware of the unsanitary bathroom when Jones called both Pino and [management-level employee Brian] Sheffield and reported the bathroom's condition." (Doc. 81 at 21.) However, there is no reason to make the jump from Pino and Sheffield hearing Jones's report and the disciplinary actions taken by Stauffer (nine months after the bathroom report) or Clunn and Gabriel (six months after that).

## III.   Punitive damages

Because the Court finds that BNSF is entitled to summary judgment on Jones's substantive claims, Jones's claim for punitive damages necessarily fails.

IT IS ORDERED that Defendant BNSF's Motion for Summary Judgment (Doc. 51) is GRANTED.

IT IS FURTHER ORDERED that all other pending motions are DENIED AS MOOT.

DATED this 29th day of April, 2020.

Dana L. Christensen, District Judge
United States District Court